FEE PAID

John K. Landay, Esq. (CA State Bar #257573)
LANDAY ROBERTS LLP
600 West Broadway, Suite 700
San Diego, CA 92101
Telephone: (619) 230-5712
Email: jlanday@landayroberts.com

Jacob M. Tubbs (*pro hac vice forthcoming)*
PRICE ARMSTRONG, LLC
1919 Cahaba Road
Birmingham, AL 35223
Telephone: 205.208.4202
Email: jacob@pricearmstrong.com

*Attorneys for Relator*

FILED
CLERK, U.S. DISTRICT COURT
9/13/24
CENTRAL DISTRICT OF CALIFORNIA
BY: MRV DEPUTY

| | |
|---|---|
| **UNITED STATES OF AMERICA,** ***ex rel.*** **JAMES MICHAEL RICHEY,**<br>*Plaintiff / Relator,*<br>v.<br>**NEVRO CORP.,**<br>*Defendant.* | Case No. 2:24-cv-07868-CBM(SKx)<br>**FALSE CLAIMS ACT COMPLAINT** |

**COMPLAINT**

Relator James Michael Richey, on behalf of himself and the United States of America, alleges and claims against Defendant, as follows:

# I. INTRODUCTION

1. This action involves widespread and egregious use of kickbacks by a medical device manufacturer to induce physicians to implant expensive pain-management devices into patients on a roster closely controlled by the manufacturer. The kickbacks include special access to patient referrals, illegitimate speaking fees, and lavish dinners and perks. Once those devices are implanted, the manufacturer further induces physicians to perform unnecessary "upgrades" that generate large commissions and reimbursements. These actions violate the Anti-Kickback Statute, the False Claims Act, and other federal and state law.

2. Spinal Cord Stimulation (SCS) is an FDA-indicated therapy for treatment of chronic pain using an implanted, battery-powered electronic device.

3. Nevro Corp. ("Nevro") is a manufacturer of medical devices, including SCS products.

4. Nevro promotes its SCS products using aggressive sales strategies designed to coerce physicians into using its products. As detailed below, Nevro's sales strategies went beyond the bounds of legality and Nevro inserted its profit-motives between patients and physicians, depriving patients of choice in selecting their health care providers.

5. Nevro sales representatives were trained to steer referrals of patients directly – and solely – to physicians who used Nevro products, and they used a

number of illicit means to do so, including directly controlling patient referrals, punishing physicians who refused to comply by directing referrals and support away from them, providing valuable business promotion to complying physicians, and even falsifying documents to enable physicians to earn higher reimbursements in exchange for using Nevro products.

6. When in 2021 Nevro became the first company in America to obtain approval to market its SCS devices for the treatment of Painful Diabetic Neuropathy, Nevro doubled down on its already aggressive sales tactics and created an entirely new division to take advantage of its new market opportunity. Within this division Nevro representatives increased and expanded upon the abusive sales techniques that Nevro had developed, and exerted near total control on patient referrals in a quid pro quo exchange of support and punishment with complying doctors.

7. Relator James Michael "Mike" Richey was a sales representative for Nevro in California from 2016 to 2023, and witnessed Nevro's illicit sales practices firsthand.

8. The majority of patients who receive Nevro SCS devices are often older or have a disability. Many or most of those patients are Medicare or Medi-Cal beneficiaries. Thus, Nevro's kickback scheme, the unnecessary procedures it generates, and the falsification of documents that Nevro engages in to cover it up cause harm to the United States and California public fisc.

9. This is an action brought by Relator on behalf of himself and the United States to recover treble damages and civil penalties under the False Claims Act (FCA), 31 U.S.C. §§ 3729-33, based on Defendant's false statements to the United States and false claims Defendant caused to be submitted to the United States for spinal cord stimulator devices, and trials and surgeries implanting those devices.

## II. JURISDICTION AND VENUE

10. This action arises under the False Claims Act, 31 U.S.C. §§ 3729-33 (the "False Claims Act"). Accordingly, this Court has jurisdiction pursuant to 28 U.S.C. § 1331. Jurisdiction is also authorized under 31 U.S.C. § 3732(a). The acts proscribed by 31 USC § 3729(a) and described in this complaint occurred in this district and elsewhere in the United States.

11. Venue lies in this judicial district under 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391(b), (c), because Defendant is qualified to do business in the state of California, transact substantial business in the state of California, transacts substantial business in this judicial district, and can be found here. Additionally, and as described herein, Defendant committed acts proscribed by 31 U.S.C. § 3729 within this judicial district. Specifically, Defendant submitted and caused to be submitted within this judicial district false claims.

## III. PARTIES

12. Nevro Corp. is a Delaware corporation with its principal place of business in Redwood City, California.

13. Relator James Michael "Mike: Richey is an adult citizen living in California. Relator worked for Nevro from 2016 to 2024.

## IV. DISCLOSURE

14. Prior to filing this Complaint, Relator voluntarily disclosed to the United States the information upon which this action is based. To the extent that any public disclosure has taken place as defined by 31 U.S.C. §3739(e)(4)(A), Relator is the original source of the information for purposes of that section. Alternatively, Relator has knowledge that is independent of and materially adds to any purported publicly disclosed allegations or transactions, and Relator voluntarily provided that information to the Government before filing this Complaint. Relator is serving contemporaneously herewith a statement of the material evidence in their possession upon which his claims are based.

## V. BACKGROUND

### A. Medicare

15. Through the Medicare program, Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395 *et seq.*, the United States provides health insurance coverage for eligible citizens. The United States Department of Health and Human Services,

specifically the Center for Medicare and Medicaid Services ("CMS"), oversees the administration of Medicare.

16. An individual may be entitled to Medicare coverage based on his or her age, disability, or affliction with end-stage renal disease. 42 U.S.C. § 426. Individuals who are insured under Medicare are referred to as Medicare "beneficiaries."

17. There are four Parts to the Medicare Program: Part A authorizes payment for institutional care, including inpatient hospital care, skilled nursing facility care, and home health care, see 42 U.S.C. §§ 1395c-1395i-4; Part B primarily covers outpatient care, including physician services and ancillary services, see 42 U.S.C. § 1395k; Part C is the Medicare Advantage Program, which provides Medicare benefits to certain Medicare beneficiaries through private health insurers, called Medicare Advantage Organizations ("MAOs"), *see* 42 U.S.C. § 1395w-21, *et seq.*; and Part D provides prescription drug coverage, see 42 U.S.C. § 1395w-101, et seq.; 42 C.F.R. § 423.1, *et seq.*

**B. Medicare Part B**

18. CMS contracts with Medicare Administrative Contractors ("MACs") to assist in the administration of Medicare Parts A and B. *See* Fed. Reg. 67960, 68181 (Nov. 2006). MACs generally act as CMS's agents in reviewing and paying Part A and Part B claims submitted by healthcare providers and perform administrative

functions on a regional level. See 42 C.F.R. § 421.5(b); *see also* 42 U.S.C. §§ 1395h, 1395u; 42 C.F.R. §§ 421.3, 421.100, 421.104.

19. Under Medicare Part B, a physician may submit claims for reimbursement using either a hard copy or electronic CMS 1500 form. In doing so, the physician must certify that he/she has knowledge of Medicare's requirements, and that the individual claim complies with applicable laws and regulations.

**C. Medicare Part C**

20. Under Medicare Part C, the Government pays each MAO a fixed monthly payment for each Medicare beneficiary enrolled in the MAO's plan. The Government adjusts these payments for various risk factors that affect expected healthcare expenditures, including the health status of each enrollee. The adjustments are intended to ensure that MAOs are paid more for those enrollees expected to incur higher healthcare costs and less for healthier enrollees expected to incur lower costs.

21. To obtain payments based on adjustment for health status, MAOs submit diagnosis codes to the Government for the beneficiaries in their Medicare Advantage plans. These diagnosis codes are based on the beneficiaries' medical encounters (e.g., office visits, surgical procedures, and hospital stays). Using these diagnosis codes, the Government creates a risk score for each beneficiary. The beneficiary's risk score is then used to calculate monthly payments to the MAOs for

that beneficiary for the following year. In general, the more numerous and severe the beneficiary's conditions, the higher his/her risk score will be, and the greater the risk-adjusted payments to the MAO will be during the next year.

**D. Medicaid and Tricare**

22. At all relevant times, Medicaid and Tricare/Champus regulations were substantially identical to the Medicare regulations discussed in this Complaint.

**E. Medicare Certifications**

23. Medicare regulations require providers and suppliers to certify that they meet, and will continue to meet, the requirements of the Medicare statute and regulations. 42 C.F.R. § 424.516(a)(1).

24. To participate in the Medicare program, providers must submit a Medicare Enrollment Application, Form CMS-855B. These entities must also complete Form CMS-855B to change information or to reactivate, revalidate, and/or terminate Medicare enrollment.

25. Form CMS 855B requires signatories to certify that they "agree to abide by the Medicare laws, regulations and program instructions that apply" and "that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal Anti-Kickback Statute and the Stark law)." An authorized official must sign the "Certification Section" in Section 15 of Form

CMS-855B, which "legally and financially binds [the] supplier to all of the laws, regulations, and program instructions of the Medicare program."

26. Medicare pays "claims," which are requests by a health care provider to be reimbursed (paid) for services provided to Medicare recipients. A claim contains a variety of information, including where the medical service was provided, the dollar amount being billed to Medicare, and an identification number for the health care provider (such as a physician).

27. When submitting claims to Medicare, providers certify on the CMS 1500, *inter alia*, that their claims comply "with all applicable Medicare . . . laws, regulations, and program instructions for payment including but not limited to the Federal Anti-Kickback Statute and Physician Self-Referral law (commonly known as the Stark Law)."

28. Generally, once a provider submits a CMS 1500, or the electronic equivalent, to the Medicare program, the claim is paid directly to the provider, in reliance on the foregoing certifications, without review of supporting documentation.

29. Hospital cost reports also contains a "Certification" that must be signed by the chief administrator of the provider or a responsible designee of the administrator.

30. That chief administrator or designee is required to certify that the hospital cost report "is a true, correct and complete statement prepared from the books and records of the provider in accordance with applicable instructions, except as noted ... and that the services identified in this cost report were provided in compliance with such laws and regulations."

31. The hospital cost report certification page contains a notice that: "Misrepresentation or falsification of any information contained in this cost report may be punishable by criminal, civil, and administrative action, fine and/or imprisonment under federal law."

32. A hospital is required to disclose all known errors and omissions in its claims for Medicare Part A reimbursement (including its cost reports) to its MAC.

**F. Antikickback Statute**

33. The Anti-Kickback Statute ("AKS") prohibits the payment of kickbacks in order to protect the integrity of Medicare and other federal health care programs (including Medicaid). *See* Social Security Amendments of 1972, Pub. L. No. 92-603, § 242(b)-(c), 86 Stat. 1329, 1419-20; 42 U.S.C. § 1320a-7b; Medicare-Medicaid Antifraud and Abuse Amendments, Pub. L. No. 95-142, 91 Stat. 1175 (1977); Medicare and Medicaid Patient and Program Protection Act of 1987, Pub. L. No. 100-93, 101 Stat 680.

34. The AKS prohibits any person or entity from soliciting, receiving, offering, or paying any remuneration as an inducement or reward for referring, recommending, ordering, or arranging for the purchase of any item or service for which payment may be made in whole or in part by a federal health care program. 42 U.S.C. § 1320a-7b(b).

35. Subject to specified exceptions, the AKS prohibits offering or paying any remuneration that has, as one purpose, inducement of a provider's referrals to federal health care programs. Claims that include items or services resulting from a violation of the AKS are false or fraudulent under the FCA. 42 U.S.C. § 1320a-7b(g); *see also, e.g., United States ex rel. Lutz v. Berkeley Heartlab, Inc.*, 225 F. Supp. 3d 487, 498 n.2 (D.S.C. 2016) (collecting cases).

## VI. NEVRO'S SCS DEVICE

### A. Physician Trials for Nevro's SCS device Generate Large Fees

36. Spinal Cord Stimulation (SCS) is an FDA-approved procedure indicated for the treatment of chronic pain of the upper limbs (neck/shoulder/arms) and lower extremities (back/legs/feet).

37. Crucially, Medicare does not require prior authorization for an SCS trial or implant, meaning that a physician's decision to order SCS therapy almost certainly generates a valuable referral for the procedure, and a commission for the sales rep whose product is ultimately used.

38. Spinal Cord Stimulation therapy consists of two separate procedures – a temporary trial and a permanent implant. These procedures are done by interventional pain management physicians, neurosurgeons and orthopedic spine surgeons. The procedures can be completed in either an out-patient hospital setting or ambulatory surgery center (ASC), but regardless of where they are performed, the procedures generate lucrative Medicare reimbursements.

39. The SCS trial must be deemed successful in order for a permanent implant to be approved. For the trial to be considered successful, Medicare requires that the patient achieve a minimum of 50% reduction in pain and improvement in activities. If the trial is deemed successful, the patient is then a candidate for the permanent procedure.

40. Physicians earn two reimbursements for each stage of the SCS procedure – the physician's professional fee, and a facility fee.

41. Medicare reimbursement for SCS-implant procedures under CPT codes 63650 and 63655 varies based on the type of procedure performed:

a. Trial: Medicare typically reimburses physicians approximately $700 for a professional fee and $10,810 ($5,405 for each of two electrode "leads" attached to the device) in facility fees for an SCS trial.

b. For a permanent percutaneous lead implant, which can be performed by an interventional pain management physician, Medicare pays

physicians a physician fee of approximately $900 and a facility fee of around $38,500. The Medicare CPT codes are CPT 63650 x 2 ($10,810 for the placement of leads) and CPT 63685 ($27,613 for the placement of the battery/pulse generator).

c. For a permanent paddle lead implant, which may only be performed by a neurosurgeon or ortho-spine surgeon, Medicare pays a physician fee of approximately $1100 and a facility fee of $47,253. The Medicare CPT codes are CPT 63655 ($19,640 for the placement of the paddle lead and CPT 63685 ($27,613 for the placement of the battery/pulse generator).

42. The physician fee is the payment the physician receives for performing the procedure and Medicare generally reimburses about $700. The facility fee is what the hospital or ASC receives for doing the procedure and Medicare generally reimburses $10,800. The typical cost of manufacture trial leads ranges from $100-$1,200 per lead, generating in some cases more than $10,000 in profit for the surgery center for a 10-15 minute procedure. Most of these procedures are completed in "physician owned" surgery centers where the physician benefits from receiving both the professional and facility fee.

**B. Nevro's Market Expansion in 2021: Targeting New Patients**

43. On July 19, 2021, the FDA expanded the range of approved indications of Nevro's SCS device to include the treatment of diabetic neuropathy of the legs and feet.

44. In 2021, Nevro became the first company in the United States to obtain FDA approval for the use of their spinal cord stimulator for treating the pain associated with diabetes – painful diabetic neuropathy ("PDN") – something that affects millions of diabetics in the United States.[1]

45. Because treatment of peripheral diabetic neuropathy was a new market for SCS treatment, and because Nevro was the only company with an SCS device approved by the FDA for treatment of PDN in the United States, Nevro saw the potential to make significant revenue if it could capture this market before competing manufactures entered the market.

46. Nevro began directing its sales force to aggressively target the PDN market. It implemented multiple strategies to build its market share by actively controlling the referral of patients to surgeons who agreed to use Nevro products for treatment of PDN, and created a special sales division solely to market SCS devices

[1] *See* https://nevro.com/English/us/investors/investor-news/investor-news-details/2021/Nevro-Announces-FDA-Approval-of-its-10-kHz-High-Frequency-Spinal-Cord-Stimulation-Therapy-for-Treatment-of-Chronic-Pain-Associated-with-Painful-Diabetic-Neuropathy-PDN/default.aspx.

for the PDN market. The misconduct alleged in this Complaint largely focuses on actions of the Nevro PDN Sales Division.

47. Primary care physicians, podiatrists, vascular specialists, and endocrinologists all routinely provide care for patients with diabetes; pain management specialists, orthopedic spine specialists, and neurosurgeons also commonly provide care to diabetics. However, only pain management specialists, spine orthopedists and neurosurgeons perform SCS trials and implants. SCS devices, such as those sold by Nevro, are typically implanted by pain management physicians, neurosurgeons, and orthopedic spine surgeons.

48. Prior to 2021, primary care, podiatrists, endocrinologists, vascular surgeons and other physicians treating diabetes patients did not opt for SCS as a treatment option for diabetes symptoms, as it was not FDA approved. And because such physicians did not refer patients for surgical treatment of diabetic neuropathy because it was not an FDA-approved treatment option, these physicians were largely unaware of the new indication for Nevro's SCS device, and often lacked preexisting relationships with surgeons who implant SCS devices.

49. Thus, prior to FDA approval of SCS devices, many physicians who treated patients with PDN were not aware of SCS therapy as an option, and did not have close referring relationships with pain management practices and other surgeons who performed SCS implants.

50. Because of the relative lack of connections between these groups of physicians prior to FDA approval, Nevro representatives were able to exert a great degree of influence and control over how and to whom these physicians' PDN patients were referred for SCS implantation procedures.

51. In so doing, Nevro deliberately interfered with doctor-patient relationships and deprived patients of any meaningful choice in selecting physicians.

## VII. DEFENDANT'S FRADULENT PRACTICES

52. This complaint is based on the following fraudulent practices by Defendant.

53. Nevro used several tools to exploit its ability to control referrals to the fullest, in order to guarantee that patients were only referred to pain management physicians and surgeons who agreed to use Nevro SCS products.

54. From at least 2021 to present, Defendant defrauded the Government by improperly steering patients to surgeons of its choice. It did so through multiple means:

### A. Kickback Scheme: Steering Via The Nevro PDN Patient Questionnaire

55. One primary tool Nevro uses to control the referral of PDN patients is the Nevro Painful Diabetic Neuropathy ("PDN") Patient Questionnaire.

56. Nevro sales representatives provide stacks of these forms to each of their endocrinologist, podiatry, vascular, and primary care physician ("PCP")

accounts. The forms, which are ostensibly designed to collect patient information to determine a patient's suitability for an SCS device, contain a unique fax number that is assigned to a specific Nevro sales representative.

57. In essence, the form is an invitation to receive a kickback (in the form of a patient referral), and is understood by physicians as such.

58. Nevro representatives instruct their endocrinologist, podiatry, vascular, and PCP accounts to provide these forms to all of their patients who are potential candidates for trial of an SCS device, and further instruct them to fax the forms directly to their Nevro PDN sales reps upon completion.

59. Again, because SCS treatment does not require prior authorization from Medicare, once a physician deems a patient eligible for treatment, that patient needs only to be scheduled with a pain specialist or surgeon to complete the process of a trial and then permanent implantation, thereby generating a lucrative fee for the pain management physician or surgeon and a similarly profitable commission for the sale rep responsible.

60. Nevro's control over the steering of such patients was so complete that in many offices, Nevro's physician accounts would hand entire patient files over to Nevro representatives, including confidential patient information (such as patient demographics, clinic notes and insurance information), to facilitate their patients' referrals for trialing of a Nevro SCS device.

61. As a result, Nevro sales representatives were able to take lucrative new patient referrals directly to the surgeon / pain management specialists of their choice, often without any input at all from the patient's "referring" physician or even the patient themselves.

62. Combined with the relative lack of existing referral relationships among endocrinologists, podiatrists, vascular and PCP physicians to pain management physicians and surgeons upon its entry into the PDN patient market, Nevro's Nevro PDN Patient Questionnaire tool gave Nevro PDN sales reps near total control over the steering of new patient referrals from their physician accounts.

63. In an overwhelming majority of cases, new PDN patients being referred by Nevro-serviced accounts for SCS therapy never had any choice over surgeon or product; once their completed PDN Patient Questionnaires were delivered to a Nevro sales representative, the sales representative – not the referring physician – would determine which surgeon would receive the referral. Invariably, Nevro representatives steered referrals to surgeons who agreed to implant Nevro SCS products.

**B. Specific Examples of Kickbacks**

64. An example of the use and frequent abuse of the Nevro PDN Patient Questionnaire occurred with Nevro rep John Darling and Nevro associate sales representative Carla Garcia. As with other Nevro reps, Darling left stacks of Patient

Questionnaires with his PCP, endocrinology, podiatry, and vascular accounts, each of which contained a fax number at the bottom of the form which was unique to Darling. When patients of physicians at those accounts completed the forms, indicating that they were potential candidates for SCS treatments, the physician offices would send the forms directly to Nevro PDN rep Darling via the fax number on the Patient Questionnaire. Darling and Garcia also made weekly calls on the physicians to physically collect any forms that had not been immediately faxed to Darling.

65. Then, Darling and Garcia would take these new patient referrals directly to pain management physicians and surgeons of their choice – typically Pacific Pain Physicians, Kern Island Pain Medicine, Pain Institute of Central California, and Pacific Spine and Pain – because Darling and Garcia had an explicit agreement wherein those doctors would use Nevro SCS devices on all new patients referred to them by Darling and Garcia.

66. When in rare instances a physician office refused to commit to using Nevro SCS products for referred patients and attempted to exercise independent control over where their patients were referred, Nevro often retaliated against such physicians by reducing sales calls, providing less support to their Nevro patients, and providing less support and incentives to the office. Nevro's efforts to steer patients were so brazen that in one such example Nevro rep, Carla Garcia, scheduled

an SCS patient for an appointment with Dr. David Wahba, then physically walked that patient into Dr. Wahba's clinic for the appointment. Dr. Wahba instructed Garcia that she was not to do that again, because it threatened to interfere with Dr. Wahba's ability to exercise his own clinical judgment.

67. In another instance, Nevro PDN reps Darling and Garcia attempted to reclaim referrals back from neurosurgeon Dr. Jan Eckermann's office, because Dr. Eckermann had not trialed those referred patients with Nevro's SCS product. Darling and Garcia wanted to redirect the referrals to another more compliant provider who would use Nevro products, and directly asked Dr. Eckermann's office manager, Harpreet Mahi, to assist them in releasing the referrals from Eckermann's practice so Darling and Garcia could steer them elsewhere. Further, in retaliation for not using SCS devices on their recent referrals, Darling and Garcia ceased providing support to Dr. Eckermann's existing Nevro implanted patients.

68. While some physicians did exercise independent control over their referrals of PDN patients for SCS procedures, virtually all of the physicians who used the fax numbers contained on the Nevro PDN Patient Questionnaires ceded control over the referral of their patients to their Nevro sales representatives. Over 90% of such patients were steered to surgeons chosen by Nevro reps with the explicit understanding that those physicians would choose Nevro stimulator products for the procedure.

69. Nevro's near total control over referrals from their accounts gave them tremendous leverage over the surgeons to whom these valuable referrals were directed, and Nevro representatives used that control to extract explicit agreements to use Nevro products from those surgeons.

**C. Kickback Scheme: Conditioning Referrals On Use Of Nevro Products**

70. Relator Richey observed as Nevro sales representatives made it a standard practice to explicitly condition referrals of SCS patients to pain management physicians and surgeons on their agreement to use Nevro products on those referrals. If physicians balked or hesitated when asked to use Nevro products, Nevro sales representatives would explicitly withhold the referral. Relator Richey witnessed on multiple occasions as Nevro representatives told pain management physicians and surgeons that if they wouldn't agree to use a Nevro SCS product, the Nevro rep would simply take the patient to a competing pain management physician or surgeon.

71. Not only did Nevro make explicit the quid pro quo kickback (patient referral for in exchange for an agreement to use Nevro) it used both a carrot and a stick approach: Nevro representatives threatened to "cut off" surgeons and pain management physicians who would not agree to use their products exclusively. In both calls and internal emails, Nevro sales personnel openly discussed and even boasted of their ability to control referral sources. If a surgeon was not using Nevro

products, Nevro representatives would often find the physicians who were referring patients to that surgeon and redirect their referrals to other, Nevro-friendly surgeons.

72. Relator Richey witnessed this practice firsthand. Nevro maintained a "Physician Finder" tool on its website, which was purportedly designed to help patients locate physicians in their area who could consult with them about spinal cord stimulators. However, Nevro sales management directed Nevro sales personnel to ensure that the Physician Finder only listed physicians who agreed to use Nevro SCS devices primarily or exclusively.

73. Nevro Regional Sales Directors and Area Vice Presidents instructed sales representatives to "clean up" its Physician Finder tool, meaning to remove physicians that were not exclusively using Nevro products, or were not using Nevro products in the majority of their procedures. Following this explicit directive, Richey asked the Nevro employee who managed the Physician Finder, Kayla Garry, to remove Dr. Thomas Nasser from its Physician Finder because Nevro sales management had determined that Dr. Nasser was not "faithful" enough, and sometimes used SCS products made by manufacturers other than Nevro. In fact, Nevro had relationships with two other physicians in same city who exclusively used Nevro, so eliminating Nasser from the Physician Finder meant that patients using that tool to find physicians in their area would find ***only*** physicians that used exclusively Nevro products.

74. When Relator Richey, following this direction of his managers, asked that Dr. Nasser be removed from the Physician Finder, Garry removed him, and followed with a confirming directive to a colleague that, until the Physician Finder change had processed, "can you make sure that we don't refer any web leads to Dr. Thomas Nasser?"

### D. Specific Examples of Unnecessary Procedures Generated By Kickbacks

75. Nevro's ability to feed patients to pain management physicians led to gross abuses of Medicare. For instance, Nevro identified a pain management doctor in Las Vegas, Dr. Godwin Maduka of the Las Vegas Pain Institute and Medical Center, as a likely target for increased use of its products. Will Fonte, a sales rep covering Dr. Maduka, and Fonte's Regional Manager Kevin Alverson, disregarded concerns over improprieties in Dr. Maduka's practice and instead focused on him as part of a Nevro contest to increase the number of SCS trials.

76. During the period of this contest, Nevro sales rep Fonte was able to steer a sufficient volume of patients to Dr. Maduka such that Dr. Maduka performed over 150 trials on Medicare patients. Dr. Maduka was seeing some of these referrals as new patients in his office, and then performing SCS trials on them the same day – despite many of these patients being inappropriate for SCS. Less than 5 patients trialed by Dr. Maduka during this period went on to receive permanent implants, yet their trials generated many thousands of dollars in commissions for Nevro reps and

hundreds of thousands of dollars in fees for Dr. Maduka's practice at Medicare's expense.

**E. Kickback Carrot/Sticks: Controlling Patient Referrals Through Retaliation**

77. Nevro reps also retaliated against pain management physicians and surgeons outside the PDN market. If Nevro reps learned that a particular pain management physician or surgeon would not work with Nevro on SCS products, they would begin targeting ***all*** sources of that pain management physician or surgeon's referrals, in an attempt to steer them to a Nevro-friendly destination.

78. Nevro reps targeted surgeons, specifically: in cases where pain management physicians performed only the initial trial of a Nevro product but sent patients to surgeons to perform the permanent implant, Nevro reps would retaliate against any surgeons who did not reciprocate and refer their own potential trial patients to be trialed with Nevro products. In such cases, Nevro representatives would encourage pain management physicians to switch to different surgeons who referred trial patients to Nevro-exclusive pain management physicians.

79. Relator Richey participated in multiple conference calls with his fellow Nevro sales reps, managers, and supervisors, where the practice of controlling referrals and sending them only to pain management physicians and surgeons who would use Nevro products was discussed and openly encouraged. These

conversations occurred at Regional Sales Meetings, National Sales Meetings, via conference calls and emails.

80. Nevro Regional Sales Directors Michael Patterson and Brian Scoggin, Area Vice Presidents Doug Heidrich and Kevin Whelan frequently participated in these calls. Nevro sales managers referred to situations where Nevro representatives had steered referral business away from a pain management physician or surgeon in retaliation for refusal to use Nevro products, as "Success Stories."

81. Nevro sales personnel routinely exchanged text messages with pain management physicians and surgeons confirming that they had received referrals steered by Nevro representatives in order to make explicit the source of the referral, and the expected use of a Nevro SCS implant. Nevro representatives contacted physicians who had seen Nevro-steered patients to confirm that they were using Nevro products, and pressured them to switch back to Nevro if they had used competitor products with a Nevro-steered patient. Nevro sales reps even used phrases like "bringing a physician to their knees" or "have them crawling back" or "show them who really controls the patients," etc., to discuss the effect of their retaliation on non-conforming physicians who would not agree to use Nevro SCS products in exchange for referrals.

82. The threat of retaliation by Nevro representatives effectively deprived patients and physicians of independent choice in healthcare decision-making. The

danger of being "cut-off" by Nevro representatives from patient referrals effectively barred competitor products from physicians who did not agree to use Nevro products. Relator Richey, now working for a Nevro competitor, has personally encountered this: multiple physicians refuse to even consider a competing product because doing so would endanger their stream of Nevro referrals.

83. Nevro's pressure and retaliation campaign worked. Relator Richey spoke with numerous physicians who confirmed that they maintained close track over the source of referrals brought in by sales representatives,

84. In so controlling the referral of patients from PCPs, endocrinologists, podiatrists, and vascular physicians to implanting surgeons, Nevro representatives infringed on innumerable physician-patient relationships and improperly steered thousands of patient referrals to surgeons solely for the purpose of earning commissions on Nevro products.

**F. Practice Building: Illegitimate Speaking Fees and Lavish Dinners**

85. Nevro's PDN sales force routinely engaged in illegal "practice building," or practice development, in violation of the Anti-kickback and False Claims Acts.

86. The Anti-Kickback Statute prohibits the payment of remuneration to induce the referral or use of items or services paid for by federal health care

programs. Remuneration includes not only cash payments but also offers or payments made "in kind."

87. In violation of the AKS, Nevro sales representatives focused their marketing efforts on forging connections between endocrinologists, primary care physicians, podiatrists, and vascular specialists (referral sources) and pain management physicians / surgeons (referral targets), with Nevro at the center of those connections.

88. While Nevro's sales force did not offer cash to obtain referrals or induce sales, it did offer in-kind compensation to referrals and referral targets to build and maintain its control over these practices' use of SCS products. Nevro frequently lavished dinners on these groups of physicians, provided in-office support for screening of PDN patients, conducted "lunch and learn" training sessions for pain management physicians and surgeons in potential referring offices, hosted dinners focused on introducing pain management physicians and surgeons to referring physicians, for the sole purpose of creating an introduction for referral purposes.

89. Nevro lavished money on physicians and physician adjuncts (Nurse Practitioners and Physician Assistants) in efforts to strengthen its relationships with these potentials sources of PDN business. Notably, Nevro's sales force gave thousands of dollars to physician adjuncts – who cannot perform Nevro trials or implants – because those providers often screen and refer patients. In 2023, Nevro

reported spending over $20,000 each on three nurse practitioners and PAs, and thousands of dollars each for many more.[2] In 2023 alone, Nevro reported over $2,587,358.51 in payments to physicians and hospitals.

### G. Specific Examples of Practice Building Kickbacks

90. One example of such improper "practice building"-as-kickback occurred at Stockdale Podiatry, a large podiatry group in California. Stockdale Podiatry does not provide pain management services or perform SCS surgery, so it is not and cannot be a customer for Nevro SCS products. Stockdale Podiatry does treat a large number of diabetic patients, many of whom are potential candidates for SCS procedures. On March 20, 2024, Nevro hosted at its expense a large "educational" dinner party for physicians, nurse practitioners and physician assistants to discuss diagnosis and treatment options for diabetic neuropathy, and to promote the Stockdale Podiatry practice. This practice building partnership worked: the Stockdale Podiatry office has provided over 50 referrals of patients to Nevro representatives John Darling and Carla Garcia, who then steer those referrals to pain management physicians and surgeons who will use only Nevro products. Thus, in exchange for promoting and entertaining Stockdale Podiatry, Nevro directly obtained many dozens of valuable referrals.

[2] *See* https://openpaymentsdata.cms.gov/company/100000136428.

91. Nevro representatives also engaged in a number of other improper practice building activities. In all such situations, Nevro representatives performed multiple valuable services for these practices specifically designed to promote the purchase of Nevro products:

92. For instance, Nevro representatives Brian Hall and his Regional Sales Director Brian Scoggins identified a podiatrist in the San Diego area as a potential referral source. That podiatrist maintained an investment interest in a nearby ambulatory surgery center. Nevro representative Hall contacted Relator Richey to ask for an introduction to Dr. Lee Marek, a retired podiatrist who also supervised and maintained an interest in that same ASC, in an attempt to market the potential financial benefits from the addition of Nevro PDN SCS cases to the podiatrist and Dr. Marek. Nevro's representatives (Hall and Scoggins) then worked with that podiatrist to both model the financial benefits of performing Nevro SCS trials, and to connect them with a pain management physician who could perform procedures in the surgery center the podiatrists owned, earning them a share of each procedure performed there.

**H. Code Pulling**

93. Nevro representatives offered to perform "code-pulling" services for its physician clients, where in exchange for helping a practice find patients that could

benefit from SCS implants, Nevro expected its physician clients to use Nevro SCS products on the patients its reps identified.

94. This practice, done at the explicit direction of Nevro sales management, was a mainstay in Nevro's sales force and in its PDN Sales Division, and a requirement for all Nevro sales reps. The practice entailed the Nevro representative gaining access to a physician or physician office's complete patient electronic medical recordkeeping system ("EMR"), then providing the office with a list of specific ICD-10 codes assigned to patients in a given timeframe (typically the preceding 12 or 18 months) which were related to Nevro's SCS indications. This allowed the offices to identify patients who were candidates for Nevro's SCS. Further, Nevro would often filter its code-pulling efforts by insurance provider, specifically to identify Medicare-insured patients for whom no prior authorization was required, making those patients identified especially valuable referrals to pain management physicians or surgeons.

95. The code-pulling service was offered as a way for a physician practice to identify patients who could potentially benefit from SCS treatment, but was explicitly conditioned on granting Nevro access to an entire database of patients who were valuable referrals. In the case of pain management and spine / neuro practices that performed SCS implants themselves, Nevro's code pulling was perhaps even more effective, since each patient identified by Nevro as a potential SCS candidate

could generate a Medicare allowable charge of $10,000 for an SCS trial and a $40,000 Medicare allowable charge for an implant, and a lucrative referral commission for the Nevro rep.

96. Nevro tracked the amount of money it earned from referrals created by its code-pulling efforts, and used it as an incentive to motivate its sales force to continue this effort. Relator estimates that this practice caused the Government to pay in excess of a million dollars in false claims.

97. John Darling and Carla Garcia routinely conducted such PDN code pulls for their physician clients, including for Pacific Pain Physicians. In doing so, they steered PDN referrals to pain management physicians and surgeons of Nevro's choice, for the benefit of increasing sales of Nevro products.

**I. MediCal and Medicare Advantage Rebate Abuse**

98. In California, Nevro's sales division concocted a separate scheme to illegally drive sales of its SCS devices. In contrast to Medicare, California's Medicaid program severely limits reimbursement on professional and facility fees for placement of SCS devices, so Nevro simply artificially inflated the prices of their SCS devices in California while simultaneously offering huge device rebates on those devices to physicians, thus offsetting the inflated prices and shifting the burden of paying physicians' profit margins to California taxpayers.

99. Medicare reimbursement for SCS-implant procedures varies based on the type of procedure performed:

a. Trial: Medicare typically reimburses physicians approximately $700 for a professional fee and $10,810 ($5,405 for each of two electrode "leads" attached to the device) in facility fees for an SCS trial.

b. For a permanent percutaneous lead implant, which can be performed by an interventional pain management physician, Medicare pays physicians a physician fee of approximately $900 and a facility fee of around $38,500 The Medicare CPT codes are CPT 63650 x 2 ($10,810 for the placement of leads) and CPT 63685 ($27,613 for the placement of the battery/pulse generator).

c. For a permanent paddle lead implant, which may only be performed by a neurosurgeon or ortho-spine surgeon, Medicare pays a physician fee of approximately $1100 and a facility fee of $47,253. The Medicare CPT codes are CPT 63655 ($19,640 for the placement of the paddle lead and CPT 63685 ($27,613 for the placement of the battery/pulse generator).

100. By contrast, California Medi-Cal's reimbursement was far lower: Medi-Cal SCS cases typically pay a professional fee of $400 and a facility fee of

$1,700 for an SCS trial, significantly lower than Medicare. However, California's Medi-Cal reimburses providers up to $5,000 for the cost of the SCS product.

101. Thus, to overcome any hesitation and promote use of its product in California, Nevro's Sales Division would invoice physicians $2,500 per lead -- $5000 per case – for the SCS devices. Then, assuming those physicians used a sufficiently large number of Nevro electrode leads per quarter, Nevro would offer "rebates" to these physicians of $2,400 per lead, thus making it appear to Medi-Cal that the physician had incurred a $5,000 expense for each SCS patient, while in reality merely paying California physicians an extra $4,800 in profit for each SCS case they performed.

102. Relator reviewed invoices from Nevro where it invoiced California physicians an inflated "list" price for a Nevro device, in order for the physician to obtain a receipt he would could then submit to Medi-Cal or Medicare replacement plans which would reimburse the physician based off the invoice. Nevro then "rebated" money back to the physician in an amount equal to a previously-agreed-upon price, allowing the physician to generate a healthy profit from the procedure. Nevro tied eligibility for this "rebate" scheme in California to ordering or using a specified number of SCS products in a quarter.

103. Nevro applied this unlawful rebate scheme both to trial leads and to permanent implants for MediCal and Medicare Advantage patients. In both cases,

Nevro would generate invoices for inflated prices, for which it would then issue "rebates" to preferred customers – allowing them to bill MediCal and Medicare Advantage providers an inflated rate, while earning thousands of dollars of profit for each device as a result of the rebate at California and the United States Treasury's expense.

104. As a result of Nevro's scheme, California and the United States both overpaid thousands of dollars for each Nevro device sold to favored physicians as part of this rebate program, solely so that those physicians could earn healthy profit margins on procedures installing Nevro devices.

**J. Unnecessary Procedures: Device Replacement / Battery Swaps**

105. Another tool used by Nevro to unlawfully increase the sales of its SCS devices was to encourage unnecessary and premature replacement of its devices and batteries simply to increase sales and profits for unscrupulous physicians and sales representatives.

106. Medicare does not require prior authorization for spinal cord stimulator trials or implants, nor does it do so for procedures "switching" out the battery / pulse generator which is the core of the SCS product, and the highest revenue generator for Nevro.

107. Nevro launched its Senza I SCS device in the US in 2015; it has since released Senza II, Omnia, and Omnia IQ devices. All Nevro devices are warrantied

for ten years, meaning the very oldest Nevro devices sold in the U.S. are still under warranty.

108. All of Nevro's battery / pulse generator devices perform the same essential function – delivering pulses of electronic stimulation through electrode leads placed in the body. All of Nevro's devices were designed – and again, warranted – to last for at least ten years. Despite this, Nevro aggressively pushed its sales team to promote a "swap" of implanted battery / pulse generators each time a new battery/pulse generator was approved in the U.S. market.

109. Relator observed that, with each new Nevro device release, Nevro would run reports on all patients in a given salesperson's territory with an implanted Nevro device, showing both the type of device implanted and date of their implant. Nevro would then contact patients and physicians and aggressively persuade them to "upgrade" their implant by "swapping" their existing implant to the new and "better" implant – with no regard whatsoever for the necessity of the swap.

110. This sales strategy was particularly effective on physicians, who could easily generate thousands of dollars in fees per patient for simply replacing a perfectly-functional Nevro device with years of remaining warranty, for a new device that performed the same essential function.

111. The device / battery replacement sales strategy was so pervasive at Nevro that it was literally integrated into its sales force's business plan, including

Relator Richey, who was expected to include device replacement as part of his 30-60-90 Business Plan. While interviewing for a promotion, Relator Richey further witnessed as premature device replacement was discussed in every internal interview he had with Nevro leadership (including with other Regional Directors, two Regional VPs, the Senior VP of US Sales, and the COO).

**COUNT ONE: FALSE CLAIMS**

112. Relator adopts and incorporates the previous paragraphs as though fully set forth herein.

113. By and through the fraudulent schemes described herein, Defendant knowingly – by actual knowledge or in deliberate ignorance or with reckless disregard of the truth or falsity of the information – presented or caused to be presented false or fraudulent claims to the United States for payment or approval, as follows:

a. Kickbacks: Defendant fraudulently controlled and steered referrals of patients to physicians who would order its products on a quid pro quo basis;

b. Kickbacks: Defendants provided monetary and nonmonetary compensation, in the form of paid speaker roles, meals and entertainment, and practice building services to physicians as a reward for using its SCS devices;

c. Unnecessary Procedures: Defendants urged physicians and patients to replace or "upgrade" perfectly functional SCS devices which were still under warranty, solely to generate commissions for sales representatives and surgical fees for physicians;

d. Falsification: Defendants created falsified invoices to assist providers in making false claims for excess reimbursements from MediCal and managed Medicare.

114. The United States paid the false claims described herein.

115. Defendant's fraudulent actions, as described *supra*, are part of a widespread, systematic pattern and practice of knowingly submitting or causing to be submitted false claims to the United States through unlawfully depriving patients of choice in choice of providers, paying unlawful kickbacks to physicians who use its products, falsifying invoices for unlawful reimbursements, and through unnecessary replacements of functioning products under warranty.

116. Defendant's fraudulent actions described herein have resulted in damage to the United States equal to the amount paid or reimbursed to Defendant and others by the United States through Medicare and Medicaid for such false or fraudulent claims.

117. WHEREFORE, Relator demands judgment in Relator's favor on behalf of the United States, and against Defendant, in an amount equal to treble the damages

sustained by reason of Defendant's conduct, together with civil penalties as permitted by 31 U.S.C. § 3729, attorneys' fees and costs, and such other, different, or further relief to which Relator may be entitled.

## COUNT TWO: FALSE RECORDS

118. Relator adopts and incorporates the factual allegations contained in the previous paragraphs (except those in Count One) as though fully set forth herein.

119. By and through the fraudulent schemes described herein, Defendant knowingly – by actual knowledge or in deliberate ignorance or with reckless disregard of the truth or falsity of the information – made, used, or caused to be made or used, false records or statements material to a false or fraudulent claim or to get a false or fraudulent claim paid or approved by the United States in that Defendant fraudulently used the coding system and other false records intended to support its fraudulent billing to the United States, all in violation of federal statutes and regulations.

120. The false records or statements described herein were material to the false claims submitted, or caused to be submitted, by Defendant to the United States.

121. In reliance upon Defendant's false statements and records, the United States paid false claims that it would not have paid if not for those false statements and records.

122. Defendant's fraudulent actions described herein have resulted in damage to the United States equal to the amount paid or reimbursed to Defendant and others by the United States for such false or fraudulent claims.

123. WHEREFORE, Relator demands judgment in Relator's favor on behalf of the United States, and against Defendant, in an amount equal to treble the damages sustained by reason of Defendant's conduct, together with civil penalties as permitted by 31 U.S.C. § 3729, attorneys' fees and costs, and such other, different, or further relief to which Relator may be entitled.

## COUNT THREE: REVERSE FALSE CLAIMS

124. Relator adopts and incorporates the factual allegations contained in the previous paragraphs (except those in previous counts) as though fully set forth herein.

125. By and through the fraudulent schemes described herein, Defendant knowingly – by actual knowledge or in deliberate ignorance or with reckless disregard of the truth or falsity of the information – made, used, or caused to be made or used, false records or statements material to an obligation to pay or transmit money or property to the United States, or knowingly concealed or knowingly and improperly avoided an obligation to pay or transmit money or property to the United States.

126. Defendant knew that it had received inflated Medicare payments based on inaccurate and falsified coding, yet Defendant took no action to satisfy its obligations to the United States to repay or refund those payments and instead retained the funds and continued to bill the United States.

127. As a result of Defendant's fraudulent conduct, the United States has suffered damage in the amount of funds that belong to the United States but are improperly retained by Defendant.

128. WHEREFORE, Relator demands judgment in Relator's favor on behalf of the United States, and against Defendant, in an amount equal to treble the damages sustained by reason of Defendant's conduct, together with civil penalties as permitted by 31 U.S.C. § 3729, attorneys' fees and costs, and such other, different, or further relief to which Relator may be entitled.

## COUNT FOUR: AKS VIOLATION AS FCA PREDICATE

129. Relator adopts and incorporates the factual allegations contained in the previous paragraphs (except those in previous counts) as though fully set forth herein.

130. Defendant's submission of Medicare and Medicaid claims were rendered in violation of the Anti-Kickback Statute ("AKS") for federal health care programs, 42 U.S.C. § 1320a–7b, because Defendant entered into improper financial

relationships with and gave kickbacks to pain physicians and surgeons in order to induce them to use Nevro SCS products.

131. Defendant's fraudulent actions, as described *supra*, are part of a widespread, systematic pattern and practice of knowingly submitting or causing to be submitted false claims to the United States through illegal referrals and fraudulent billing of the United States through Medicare or Medicaid.

132. Because compliance with the AKS is a material consideration for Medicare and Medicaid, the claims Defendant submitted for services rendered in violation of these statutes were "false or fraudulent" for purposes of the FCA.

133. WHEREFORE, Relator demands judgment in Relator's favor on behalf of the United States, and against Defendant, in an amount equal to treble the damages sustained by reason of Defendant's conduct, together with civil penalties as permitted by 31 U.S.C. § 3729, attorneys' fees and costs, and such other, different, or further relief to which Relator may be entitled.

///

///

///

///

///

///

## VIII. JURY DEMAND

134. Relator, on behalf of himself and the Government, demands a jury trial on all claims alleged.

Dated: September 10, 2024

*Jacob M. Tubbs*
Jacob M. Tubbs (pro hac vice forthcoming)
PRICE ARMSTRONG, LLC
1919 Cahaba Road
Birmingham, AL 35223
Phone: 205.208.4202
(jacob@pricearmstrong.com)

*John K. Landay*
John K. Landay (Cal Bar No. 257573)
LANDAY ROBERTS LLP
600 W. Broadway, Suite 700
San Diego, CA 92101
Phone: 619.230.5712
jlanday@landayroberts.com

**Attorneys for Plaintiff / Relator James Michael Richey**

John K. Landay, Esq. (CA State Bar #257573)
LANDAY ROBERTS LLP
600 West Broadway, Suite 700
San Diego, CA 92101
Telephone: (619) 230-5712
Email: jlanday@landayroberts.com

Jacob M. Tubbs (*pro hac vice forthcoming)*
PRICE ARMSTRONG, LLC
1919 Cahaba Road
Birmingham, AL 35223
(205) 208-4202
Email: jacob@pricearmstrong.com

Attorneys for Relator

**UNITED STATES DISTRICT COURT**
**CENTAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **[UNDER SEAL]**,<br><br>*Plaintiff(s)*,<br><br>v.<br><br>**[UNDER SEAL]**,<br><br>*Defendant*(s). | Case No. ______________________<br><br>**FALSE CLAIMS ACT COMPLAINT** |